SECOND DIVISION
September 2, 2008

No. 1-07-3539

| | | |
|---|---|---|
| TYCO ELECTRONICS CORPORATION, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS TOOL WORKS, INC., | ) | Honorable |
| | ) | Brigid Mary McGrath, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE SOUTH delivered the opinion of the court:

Tyco Electronics Corporation purchased surge protection components which failed to perform as expected. Consequently, Tyco filed an action against the manufacturer, Illinois Tool Works, for breaches of contract and warranty and presented to a jury evidence of more than $9 million in damages. The jury returned a verdict in the amount of $2 million, and Tyco now appeals the denial of its motion for a retrial limited to the issue of damages. We affirm.

Tyco's customer, Motorola, made cable access units which provided Internet, telephone and cable television service through a single cable. Tyco produced the cable connection for Motorola's access units. The connection, called the "Superblock," contained a gas-filled tube which provided surge protection. After another vendor's gas tubes proved to be unsatisfactory, Tyco contracted to purchase the surge protection tubes from Illinois Tool Works (ITW). ITW assembled Superblocks which included its gas tubes and shipped them to Motorola on Tyco's behalf.

Soon after their installation in residences located in Australia, the Superblocks' surge protection components began to short-circuit prematurely. Motorola tested the ITW gas tubes, compared them to tubes which were made by other vendors, and hired surge protection experts to conduct further tests. The test results suggested that the ITW tubes and related backup assembly caused the premature Superblock short-circuits in the Australian installations. Motorola decided to replace the Superblocks containing ITW tubes with units that used another vendor's tubes. Motorola then demanded that Tyco reimburse it for those replacement costs. Tyco settled Motorola's potential claims for $7.7 million, which included a cash payment of more than $4.8 million and a credit against future product purchases of more than $2.8 million. Tyco then filed suit against ITW, alleging that ITW breached the contract, as well as the express performance warranties and implied warranties of fitness and merchantability.

At trial, Tyco presented evidence that the surge protection units provided by ITW did not meet ITW's own specifications, were not suitable for use in the Superblock, and were not properly designed and manufactured. ITW asserted that any failure of the unit to meet its own specifications related to the long-term life of the units, and any breach of warranty regarding those specifications did not cause the short-term failures in the Superblock installations.

ITW also asserted that the surge protector failures were caused by the hot and humid conditions in the locations where the Superblocks were installed, that Motorola and Tyco established the specifications for the surge protection units, and the two companies could have demanded that the units pass industry-recognized tests for performance in those conditions. ITW claimed that Motorola did not ask for units which would have passed more stringent tests because it did not want to reveal details of the workings of its cable access hardware and the

Superblock, and it wanted to avoid the delay and expense of purchasing a unit that had passed the extra tests.

ITW argued that its surge protectors met the only industry standards Tyco had required, that Tyco and Motorola had approved the ITW units, and Motorola was responsible for the failure to communicate any requirement for higher standards. ITW also argued that Motorola's responsibility would have shielded both Tyco and ITW from liability for the Superblock failures in Australia, and Tyco agreed to the cash settlement to preserve larger and more lucrative business relationships with Motorola. Accordingly, ITW denied liability for Tyco's losses in settling Motorola's potential claims.

Tyco presented expert testimony asserting that its payments to Motorola and other costs associated with the Superblock failures caused approximately $9.1 million in damages. ITW's damages expert, Glenn Sheets, testified that his examination of the costs of the incident led him to conclude that Tyco's damages were approximately $4.7 million. Sheets did not include Tyco's payments and credits to Motorola as an element of damages; instead, he attempted to calculate the cost of producing and installing the actual number of new Superblocks needed to replace those that had been deployed with the ITW surge protectors. Neither party suggested the measure of damages that would have been the proper compensation for the surge protectors' failure to meet ITW's own long-term performance specifications.

The jury returned a verdict of $2 million for Tyco. It completed special verdict forms which indicated that it found ITW had breached its contract with Tyco and breached express warranties under the contract and Tyco had proven that it had sustained damages. Tyco moved

for a new trial limited to the issue of damages; it did not alternatively seek a retrial of all of the issues. The trial court denied Tyco's motion, and this appeal followed.

Tyco contends that ITW's damages expert, Glenn Sheets, testified in violation of Supreme Court Rule 213(f)(3), which requires a party to reveal the opinions and conclusions of its retained experts. 210 Ill. 2d R. 213(f)(3). Tyco claims that in his written report, which was produced prior to trial and in his discovery deposition, Sheets testified that he estimated Tyco's damages to be $3.94 million, and his trial testimony of $4.7 million in damages was an undisclosed change from his earlier position. However, the record contradicts Tyco's claim.

Sheets' opinion, as disclosed in both his written report and in his discovery deposition, was that Tyco's damages consisted of two elements: Tyco's cost of producing new Superblocks to replace the defective units; and the shipping and labor costs incurred by Motorola to remove the original Superblocks and install new units. In his report, in his testimony during his deposition, and in his testimony at trial, Sheets consistently asserted that the Tyco production cost element amounted to approximately $1.3 million. Sheets' written report, in its introductory summary, asserted that Motorola's "substantiated" shipping and labor costs were not more than $2.6 million. But in the detail which followed the introductory summary, Sheets' report explained that he reached the total of "substantiated" shipping and labor costs by excluding from his calculation all Superblocks shipped to Motorola after July 15, 1999. This date was based on ITW's contention that Tyco and Motorola had failed to mitigate their damages by continuing to produce and deploy the original Superblocks after deciding in mid-July that they were not performing properly. Sheets' disclosed opinion clearly identified the possible alternative formulations of the shipping and labor cost component of his damage calculation: reduced by the

exclusion of costs incurred after July 15, the shipping and labor component was $2.6 million and unreduced by the cutoff date, $3.48 million. Sheets' use of the latter calculation at trial, adding it to the $1.3 million production cost component and concluding that Tyco's damages were approximately $4.7 million, was consistent with his previously disclosed opinion and, therefore, not a violation of Rule 213.

Tyco also contends that it was denied a fair trial on the issue of damages and should be granted a retrial on that issue because Sheets' testimony violated the collateral source rule. Tyco bases this contention on the fact that an auditor for Tyco's insurer examined the company's loss claim and wrote a report of his findings which Sheets analyzed in preparing his testimony. Tyco asserts that the collateral source rule "bars ITW from presenting to the jury information calculated pursuant to an insurance policy and any evidence of the methodology and/or calculations utilized by [Tyco's insurer] in analyzing the Tyco claim." Our supreme court's statement of the collateral source rule is far less expansive. "The rule operates to prevent the jury from learning anything about collateral income." Arthur v. Catour, 216 Ill. 2d 72, 79 (2005). It "applies only to prevent defendants from introducing evidence that a plaintiff's losses have been compensated for, even in part, by insurance." Arthur, 216 Ill. 2d at 80. Sheets' trial testimony did not to refer to Tyco's insurance, the insurer's auditor, or the auditor's report in any way and thus did not violate the collateral source rule.

Tyco, citing City of Chicago v. Anthony, 136 Ill. 2d 169 (1990), argues that despite the absence of any insinuation of insurance, Sheets' testimony should have been barred because of the "doctrine of substantive inadmissibility." The Anthony court, in applying the doctrine, held that "[i]f another rule of law applicable to the case excludes the information sought to be relied

1-07-3539

upon by the expert, the information may not be permitted to come before the jury under the guise of a basis for the opinion of the expert." Anthony,136 Ill. 2d at 186.

The information at issue in the instant case is the number of Superblock replacements; Sheets used this number to calculate actual total costs of shipping and installing new Superblocks. Tyco contends that Sheets learned this number only by reading the report of its insurer's auditor. But the company does not identify any applicable rule of law requiring exclusion of evidence of the number of replacements. This number was not made inadmissible merely because it was also included in an inadmissible report reviewed by Sheets. Tyco claims that it was unduly prejudiced because it could not cross-examine Sheets about the basis of his opinion without referring to the insurance, but Sheets testified that he arrived at the number of replacements by examining the actual invoices generated by customer installations in Australia, and Tyco's counsel cross-examined him extensively about his processes and specific invoices. We conclude that Sheets' testimony was neither improperly admitted nor unduly prejudicial.

Tyco further argues that the trial court's denial of its motion for a new trial on the issue of damages was an abuse of discretion. In support of this argument, Tyco asserts that the jury was presented with only two possible damage totals: the $9.1 million total from its witnesses and the $4.7 million estimate from ITW's expert. Tyco contends that the $2 million verdict, since it corresponded with neither calculation, was against the manifest weight of the evidence. However, a jury's verdict is not against the manifest weight of the evidence merely because it is less than the damage calculations of experts. Branum v. Slezak Construction Co., 289 Ill. App. 3d 948, 953 (1997).

In the instant case, the jury was instructed that if it found ITW breached its contract or any of its warranties to Tyco, it was to determine whether Tyco had proved any element of damages. The jury was also instructed that Tyco had the burden of proving that its settlement with Motorola was reasonable. The jury heard evidence that Motorola and Tyco were largely responsible for the deployment of nonperforming surge protection units because they wanted to avoid spending time and money on units tested to perform in the Australian heat and humidity. The jury was not instructed that it was limited to finding Tyco's settlement either entirely reasonable or entirely unreasonable and was not instructed that it was limited to assessing damages as either the sum advocated by Tyco's witnesses or the amount suggested by ITW's expert. Where the instructions have not confined the jury to a precise mathematical damage calculation, and the record suggests that a verdict may be accounted for by the jurors' decision that the plaintiff did not act reasonably to diminish his damages, a verdict for the plaintiff in an amount less than the uncontested proof of damages is not against the manifest weight of the evidence. Hillman v. Hodag Chemical Corp., 96 Ill. App. 2d 204, 209-10 (1968).

In addition, the finding that a verdict is unsupported by the evidence is not, in itself, sufficient to mandate a new trial limited to the issue of damages. A damages-only retrial is appropriate where: (1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests neither that the jury reached a compromise verdict nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability. Barr v. Groll, 208 Ill. App. 3d 318, 323 (1991). If the precise acts for

1-07-3539

which a defendant is held liable determine the extent of liability, the liability and damages issues are so intertwined that a damages-only retrial would be improper. Glassman v. St. Joseph Hospital, 259 Ill. App. 3d 730, 769 (1994). Because the record in the instant case demonstrates that different warranty breaches by ITW would result in different damages, liability and damages are not so distinct that a damages-only retrial would be fair to ITW.

If the plaintiff seeks a new trial limited to the issue of damages and this court determines that a limited issue trial is not appropriate, in the absence of an alternative motion for a retrial on all issues, the jury's verdict will be affirmed even if it is found to be inadequate. Sommer v. City of Taylorville, 59 Ill. App. 3d 765, 768-69 (1978); Werner's Furniture, Inc. v. Commercial Union Insurance Co., 39 Ill. App. 3d 59, 72-73 (1976); Brunner v. Slupe, 8 Ill. App. 3d 924, 926 (1972).

We conclude that Tyco was not denied a fair trial on the issue of damages, the jury's verdict was not contrary to the manifest weight of the evidence, and even if the evidence failed to support the jury's verdict, a new trial which would be limited to the issue of damages would be inappropriate because of the linkage between the liability and damage issues presented. For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HALL and KARNEZIS, JJ., concur.