# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Solis v. BASF Corp.*, 2012 IL App (1st) 110875

---

| | |
|---|---|
| Appellate Court Caption | GERARDO SOLIS, Plaintiff-Appellee, v. BASF CORPORATION, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-0875 |
| Filed | October 4, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a negligence and strict liability action alleging that plaintiff's lungs were injured by a synthetic chemical he used in his work in the flavoring industry, the trial court's error in directing a verdict for plaintiff on defendant distributor's claim that the action was barred by the statute of limitations required that the cause be remanded for a new trial, since defendant presented evidence plaintiff knew of the possible wrongful cause of his lung condition more than two years prior to the time his complaint was filed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2006-L-012105; the Hon. Clare E. McWilliams, Judge, presiding. |
| Judgment | Reversed and remanded. |

| Counsel on Appeal | John N. Scholnick, Neil Lloyd, Heidi K. Oertle, and Shelley L. Merkin, all of Schiff Hardin LLP, of Chicago, for appellant. |
| | Kenneth B. McClain, of Humphrey, Farrington & McClain, of Independence, Missouri, and Susan Ford Robertson, of Robertson Law Group, of Kansas City, Missouri, for appellee. |
| Panel | JUSTICE EPSTEIN delivered the judgment of the court, with opinion. Justices McBride and Howse concurred in the judgment and opinion. |

## OPINION

¶ 1  In this personal injury case, plaintiff Gerardo Solis claims that his lungs were injured while he worked with diacetyl, a synthetic chemical used in artificial butter flavoring. Solis brought negligence and strict liability claims for failure to warn and defective design against BASF Corporation (BASF), one of the distributors that supplied diacetyl to Solis's employer, Flavorchem. The jury returned a verdict for Solis, and BASF now appeals. BASF raises a host of legal and evidentiary errors, which it claims are the basis for a judgment as a matter of law or at least a new trial. Most central to our resolution of this appeal, BASF claims that the trial court erred by directing a verdict in favor of Solis on BASF's statute of limitations defense, where BASF presented evidence that Solis was aware of his lung injury and its wrongful cause more than two years before he filed suit. Because we find error in the trial court's decision to direct a verdict in favor of Solis on the statute of limitations question, we reverse and remand for a new trial.

¶ 2                          BACKGROUND
¶ 3  We provide an overview of the relevant facts, and we explore the trial testimony in greater detail, as necessary, as part of our analysis. BASF primarily argues that the evidence was insufficient as a matter of law to support Solis's claims, and we therefore focus on the evidence presented by Solis, as the parties have on appeal.

¶ 4                    Solis's Employment History
¶ 5  Gerardo Solis worked in the flavoring industry for nearly 20 years for three different Illinois employers. From 1987 to 1989, Solis worked as a quality control technician and assistant supervisor at Olmarc Packaging (Olmarc), which packaged cake mixes, cereals, microwave popcorn, and similar foods for companies like Pillsbury. Solis sometimes worked in a production area at the Olmarc plant where butter flavorings were mixed with other ingredients.

¶ 6    From 1989 to 1998, Solis worked at Flavors of North America (FONA), which made flavorings (including cherry, blueberry, vanilla, and butter) for food ingredients. Solis started as a compounder, a job where he mixed different ingredients into a finished form, before becoming a supervisor in 1991. Solis worked in two parts of the production area: the spray dry area, where he would heat a flavored liquid until it became a powder; and the liquids and powders area, where various pieces of equipment were used to make flavoring, including butter flavoring. As a compounder and supervisor in the production area, Solis worked with diacetyl and other chemicals, including acetoin, butyric acids, and benzaldehyde.

¶ 7    From 1998 to 2006, Solis worked at Flavorchem, another manufacturer of flavorings. Solis again worked as a compounder for approximately two years and then was promoted to a supervisor. In both positions, Solis spent about 90% of his time in the powder area making powdered flavorings, and he worked in the liquids area for about 10% of his time. In 2000, Solis noticed an uptick in the use of diacetyl in butter and other flavoring. Solis testified that his "main exposure" to diacetyl in butter flavors was from 2000 to 2004, and from 2004 to 2006, he was around diacetyl less often when there was an increase in hiring at Flavorchem. Solis worked with a variety of chemicals, including acetoin, benzaldehyde, and butyric acid. While he was mixing products, Solis would sometimes wear a dust mask or a cartridge respirator, but he would take this off while walking around the production area.

¶ 8                    BASF's Supply of Diacetyl to Flavorchem

¶ 9    BASF distributed diacetyl during parts of the 1990s and 2000s. BASF purchased diacetyl from BASF's indirect German parent company, BASF Aktiengesellschaft (AG),[1] which had it manufactured by a third-party contractor. BASF sold no diacetyl to Olmarc or FONA while Solis worked there. BASF sold diacetyl to Flavorchem to make both liquid and powdered flavors, but Flavorchem purchase records (showing the total amount of diacetyl Flavorchem purchased from BASF, by date) do not specify how much diacetyl was used to make each type of flavoring.

¶ 10    The batch records at Flavorchem (identifying the supplier of the diacetyl used in each batch) show that from 2003 until June 2006 (when Solis left), Flavorchem used 4,133.57 pounds of diacetyl in the powder room, of which BASF supplied 8.4% (347.55 pounds). These were the only batch records available: the president of Flavorchem, Ken Malinowski, testified that before January 1, 2003, there was no record of which company's diacetyl was used in particular batches of flavorings. During Solis's tenure at Flavorchem, from 1998 to 2006, 9,934.5 pounds of diacetyl were used in the powder room, meaning that BASF supplied at least 3.5% of the diacetyl used in the powder room. Dr. David Egilman, an expert for Solis, testified that if he assumed that the BASF diacetyl in the plant was 2.5% to 3% of the diacetyl supplied to Flavorchem during the time Solis worked there, that amount would

_____

[1]BASF is a wholly owned subsidiary of BASF Americas Corporation; BASF Americas Corporation is a wholly owned subsidiary of BASFIN Corporation; BASFIN Corporation is a majority-owned subsidiary of BASF Nederland BV, a Dutch limited liability company; and BASF Nederland BV is in turn a wholly owned subsidiary of BASF SE (formerly known as BASF AG).

have been enough to cause Solis's disease (bronchiolitis obliterans), even "if it was his only exposure."

¶ 11    Solis testified that from 2000 to 2004, he used diacetyl on a daily basis in the powder mix area. According to a health and hygiene study conducted by National Jewish Hospital (NJH) at Flavorchem, the highest levels of diacetyl in the Flavorchem plant were in the dry mix or powder area, where Solis spent the majority of his time. Solis recalled using diacetyl supplied by Polarome, Citrus & Allied (C&A), O'Laughlin, and Elan. He estimated that 50% of the diacetyl used in the plant between 2000 and 2004 was BASF diacetyl. Solis testified on cross-examination that his estimate was based on his memory that BASF's label appeared on barrels of diacetyl and that many of the formulas he mixed contained diacetyl. On redirect examination, Solis testified his estimate was confirmed by review of Flavorchem purchase records that purportedly showed the entire amount of diacetyl (used to make powder and liquid flavorings) that BASF supplied to Flavorchem.

¶ 12                              BASF MSDS and the LC50 Study

¶ 13    Solis's failure-to-warn claims center on material safety data sheets (MSDSs) for diacetyl that BASF provided to Flavorchem. Federal Occupational Safety and Health Administration (OSHA) regulations require sellers and distributors of chemicals to provide MSDSs to purchasers, and these purchasers must make MSDSs available to their employees. OSHA's regulations also require employers to train employees to read and understand MSDSs. As Dr. Sandler, an expert witness for BASF, explained, employers "must take these MSDSs, teach the employees how to read them and what they mean" and "must train them as to the labels that are provided."

¶ 14    Solis claims that BASF's MSDS for diacetyl failed to adequately disclose information from a 1993 study, performed by AG, entitled "Study on the acute inhalation toxicity LC50 of Diacetyl FCC as a vapor in rats 4-hour exposure." The "Lethal Concentration 50" (LC50)[2] study showed that "[d]uring necropsy all animals that died showed general congestion," that "[e]xposure to high concentration led to atelactasis and bloody edema of the lungs, bronchial edema and intensified hydrothorax," and that "the mid and high concentration groups revealed extensive hyperemia of the lung, *** [and] moderate emphysema and focal hyperemia of the lungs." The study concluded that the level at which 50% of the rats died (between 2.25 and 5.2 mg/l exposure for 4 hours) fell within a concentration range classified as "moderately toxic."

¶ 15    BASF received its MSDSs for diacetyl from AG. From 1995 to 2006, BASF's MSDS reported the study data as "Rat, Inhalation LC50–2.25-5.2 MG/L" with the designation "Moderately Toxic." BASF's MSDS stated that "[i]nhalation causes irritation to the respiratory tract" and also reported that "[t]here are no known chronic effects associated with this material." The MSDS advised using an "[a]pproved organic vapor mist respirator as necessary" and "local exhaust to control vapors/mists." In May 2006, the California

_____

[2]For inhalation experiments, the concentration of the chemical in air that kills 50% of the test animals in a given time (usually four hours) is the LC50 value.

Department of Health Services contacted BASF about revisions to the MSDS for diacetyl. BASF subsequently changed its MSDS in June 2006 to add the phrase "Overexposure to high concentrations may cause pulmonary irritation that could be associated with lung disease (bronchiolitis obliterans)."

¶ 16    At Flavorchem, Solis was responsible for giving employees instruction on where to access MSDSs, and he would sometimes read various MSDSs with employees so that they had "some understanding" of what the warnings said. When asked if he read any MSDSs on diacetyl at Flavorchem, Solis explained that "[t]here was no need" because he had read "a lot of MSDSs" at FONA, including MSDSs for the diacetyl. As to the MSDS, Dianne Hamernick, a Flavorchem employee, testified that if Flavorchem had the study in hand as of 2001, it would have "updated" and "changed" the MSDS and "seen if additional personal protective equipment was needed."

¶ 17    While the parties agree that BASF received a copy of the LC50 study from AG no earlier than 2001, Solis introduced evidence regarding the inability of industry groups to obtain the study (or similar information) in the 1990s. Solis presented testimony from John Hallagan, general counsel for the Flavor and Extract Manufacturers Association (FEMA), an industry trade organization. He testified that FEMA maintains a database that contains safety information for diacetyl, available to members of FEMA and the Research Institute for Fragrance Materials (RIFM), the scientific arm of the flavoring industry. Hallagan testified that had FEMA been provided the LC50 study in the late 1990s, it would have disseminated the information to diacetyl users. Solis's counsel solicited testimony from Solis's expert witnesses that if BASF had "come forward" with the study in the 1990s, the medical and scientific community could have discovered the causal association between diacetyl and lung injury before 2002.

¶ 18        Solis's Lung Condition and Diagnosis With Bronchiolitis Obliterans

¶ 19    In 1990, a year after starting work at FONA, Solis was diagnosed with asthma. Solis testified that his asthma was under control at the time and he was still active, though he saw a doctor at least once a year between 1990 and 1999 for treatment. Solis testified that as of 1998, he had shortness of breath, coughing, and wheezing. In 1999, Solis took a pulmonary function test as part of an initial health clearance at Flavorchem. According to Solis's expert, Dr. Allen Parmet, the test showed "obstructive lung disease," though he described Solis's symptoms as "manageable" prior to 2000.

¶ 20    In 2004, Flavorchem management invited doctors from NJH, who provide "expert advice" to flavoring plants, to do an assessment of the Flavorchem facility and workers' health at the plant. As part of the visit, Solis received another pulmonary function test. The test showed decreased lung function, and Dr. Cecile Rose, a pulmonologist at NJH, recommended that Solis be taken out of the dry mix area. Solis testified that at this time, he did not associate his lung problems with his work. Sometime in late 2004 or mid-2005, Solis filled out a medical questionnaire in connection with one of NJH's visits. As part of the questionnaire, Solis was asked if he felt that particular tasks or processes in his job were likely to cause breathing problems, and he checked "yes." He also responded "yes" to the

question "Are your symptoms worse at work?" Solis testified that at the time he filled out this questionnaire, he felt that working around certain chemicals, including diacetyl, "caused [his] breathing problems." In June 2006, Solis was told by Dr. Rose of NJH that he had the lung disease bronchiolitis obliterans, a rare lung disease in which the bronchioles, the branches near the end of the bronchial tree, are scarred, obstructing the airflow. Dr. Rose told Solis that his condition was caused by exposure to diacetyl at work, and Solis testified that this was the first time he understood that his lung condition was caused by chemical exposure.

¶ 21    Before his diagnosis, Solis's lung condition had been growing progressively worse since 2000, just as the diacetyl usage increased at Flavorchem. He visited the emergency room more often, his symptoms became more severe, and he was hospitalized for a few days. Drawing from results of Solis's lung function tests, Dr. Egilman explained that Solis had lost ten percent loss of lung function between 2000 and 2009. He noted that Solis was at a "risk of death" if he contracted a cold, small virus, or infection. According to Dr. Parmet, Solis was "permanently and totally disabled" and was in need of a lung transplant.

¶ 22                                    Proceedings Below

¶ 23    Solis initially filed suit on November 17, 2006, against 20 defendants, arguing that each was responsible for Solis contracting bronchiolitis obliterans from exposure to diacetyl. Solis filed an amended complaint on August 30, 2007, adding BASF as a party. BASF was the only remaining defendant at trial. After the jury returned a verdict of $32 million, finding Solis 5% at fault and BASF 95% at fault, the trial court denied BASF's posttrial motions for judgment notwithstanding the verdict or a new trial. This appeal followed.

¶ 24                                         ANALYSIS

¶ 25    BASF contends that it is entitled to a judgment as a matter of law, or at least a new trial, for three principal reasons. First, BASF argues that the trial court erred in directing a verdict in favor of Solis on BASF's statute of limitations defense, where there was evidence showing that Solis knew of his injury and its wrongful cause more than two years before he filed suit against BASF. Second, BASF argues that there was insufficient evidence of causation because Solis failed to show that diacetyl supplied by BASF was a substantial factor in causing his injury, and because Solis admitted that he did not read BASF's MSDSs at Flavorchem. Third, BASF argues that the jury was improperly instructed that BASF had a duty to warn the flavoring industry–and not just the users of its diacetyl–about the hazards of diacetyl. Apart from these issues, BASF argues that Solis failed to make the necessary showing that diacetyl was unreasonably dangerous in order to support his strict liability claims. BASF also raises several claims of evidentiary and instructional error, arguing that it is entitled to a new trial.

¶ 26    At the outset, we mark the bounds of our review on BASF's argument that it was entitled to judgment notwithstanding the verdict (judgment *n.o.v.*) and that it was improper for the trial court to enter a directed verdict in favor of Solis on the statute of limitations issue. "[I]t is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of

the witnesses, and to decide what weight should be given to the witnesses' testimony." *Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992). A judgment *n.o.v.* or directed verdict is properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 88; *Maple*, 151 Ill. 2d at 453. In ruling on a motion for judgment *n.o.v.* or directed verdict, "a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple*, 151 Ill. 2d at 453 & n.1. If there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome, the court should not enter a judgment as a matter of law. *Id.* at 454. We review *de novo* the decision denying BASF's motion for judgment *n.o.v.* and the decision to direct a verdict for Solis. *Id.*; *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 100 (2010).

¶ 27                                            Statute of Limitations

¶ 28        BASF contends that Solis's claims are barred by the two-year personal injury statute of limitations. See 735 ILCS 5/13-202 (West 2008). In personal injury actions, the statute of limitations generally begins to run on the date of the injury. *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360 (1995). In cases of exposure to harmful substances, however, plaintiffs generally do not "discover that they suffered *any* injury until long after the tortious conduct occurred," and courts apply the discovery rule "to prevent the unfairness of charging the plaintiff with knowledge of facts which were 'unknown and inherently unknowable.' " (Emphasis in original.) *Id.* at 367 (quoting *Urie v. Thompson*, 337 U.S. 163, 169 (1949)); see Prosser and Keeton on Torts § 30, at 165-67 (W. Page Keeton et al. eds., 5th ed. 1984); see also *Clay v. Kuhl*, 189 Ill. 2d 603, 611 (2000). The discovery rule "postpone[s] the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused." *Golla*, 167 Ill. 2d at 361. When a plaintiff asserts the discovery rule to delay commencement of the statute of limitations, he has the burden of proving the date of discovery. *Gredell v. Wyeth Laboratories, Inc.*, 346 Ill. App. 3d 51, 58 (2004). According to BASF, Solis's claims were untimely because he knew or reasonably should have known of his "lung condition and its possible wrongful cause" more than two years before September 17, 2007, the date Solis filed his complaint against BASF.[3] The trial court disagreed and directed a verdict on the statute of limitations question in favor of Solis.

---

[3]BASF contends, and Solis does not dispute, that the filing date of the amended complaint, adding BASF as a party, is the operative date in this case because BASF did not receive notice of the suit until the amended complaint was served. See 735 ILCS 5/2-616(d) (West 2008) (amended complaint relates back to date of the original complaint only where added party had notice of the original complaint).

¶ 29    In this case, the trial court's directed verdict for Solis can stand if all the evidence, when viewed in its aspect most favorable to BASF, so overwhelmingly favors Solis that no contrary verdict based on that evidence could ever stand. *Lazenby*, 236 Ill. 2d at 100. "The issue of when a party knew or should have known both of the injury and that it was wrongfully caused is generally one of fact. [Citations.] Thus, in most cases, the time at which a party knows or reasonably should have known both of her injury and that it was wrongfully caused will be a disputed question for the trier of fact." *Young v. McKiegue*, 303 Ill. App. 3d 380, 387 (1999).

¶ 30    Solis contends that we can quickly dispense with the statute of limitations question because the evidence was undisputed that Solis was not diagnosed with bronchiolitis obliterans before 2006. It was this argument that convinced the trial court to direct a verdict for Solis. The court noted that because "the first time [Solis] became aware of [his diagnosis] was with Dr. Rose's note in 2006," the statute of limitations question was a "nonissue." In a posttrial order, the court reiterated that it entered a verdict in favor of Solis because he "was not officially diagnosed with [bronchiolitis obliterans] until 2006, and he filed this lawsuit in 2007."

¶ 31    We disagree that an official diagnosis was required to trigger the running of the statute of limitations. Our supreme court has explained that a plaintiff need not "know the full extent of [her] injuries before the statute of limitations is triggered." *Golla*, 167 Ill. 2d at 364. "[T]he limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries." *Id.* The prior cases of this court and our supreme court make clear that an official diagnosis is not required to trigger the statute of limitations. In *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161 (1981), for example, the plaintiff sought treatment for breathing difficulties in 1957 and was told at that time that he had " 'lung problems.' " *Nolan*, 85 Ill. 2d at 163. There was some question whether plaintiff understood that his lung problems were occupationally caused based, in part, on information he might have received from his doctor. *Id.* at 165-66. In 1973, less than two years before he eventually filed suit, the plaintiff was diagnosed with asbestosis and was told that his condition was caused by exposure to asbestos materials at work. *Id.* at 166.

¶ 32    In applying the discovery rule, the court recognized that the statute of limitations can be triggered before an official diagnosis. The court noted that the plaintiff "could not possibly have been aware of his injury until, at the earliest, 1957, *when the first symptoms began to appear*." (Emphasis added.) *Id.* at 169. While the appellate court had held that the cause of action accrued when the plaintiff " 'knew or, in the exercise of reasonable diligence, should have *discovered that he had contracted the disease asbestosis* due to defendants' acts or omissions,' " the supreme court stated that the "preferred rule is that the cause of action accrues when the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that the injury was caused by the wrongful acts of another." (Emphasis added.) *Id.* The court acknowledged that "[i]t was not until May 15, 1973, that he was told by a doctor that he had asbestosis and that his condition was caused by exposure to asbestos materials at work," but explained that "[t]he evidence is conflicting as to whether or when [the plaintiff] would have had sufficient information *to reach such a conclusion*

*earlier*." (Emphasis added.) *Id.* at 171-72.

¶ 33        *Nolan* suggests that a definitive diagnosis coupled with an explanation of the cause of the illness will generally mark the endpoint of when the statute of limitations begins to run. But it does not follow that the statute of limitations cannot begin to run before an affirmative diagnosis. As this court has recognized, "*Nolan* and later precedent firmly establish that an affirmative diagnosis of an injury is not the bellwether that gives rise to a plaintiff's claim." *Healy v. Owens-Illinois, Inc.*, 359 Ill. App. 3d 186, 194 (2005). For example, in *Wilson v. Devonshire Realty of Danville*, 307 Ill. App. 3d 801 (1999), the plaintiff argued that "she was immediately aware of symptoms of an illness but not the latent pulmonary disease, which was not diagnosed until April 1997." *Wilson*, 307 Ill. App. 3d at 805-06. The court rejected this claim, noting that plaintiff admitted that she had occupational asthma and multiple chemical sensitivity in 1995. *Id.* at 806. The court reasoned that "the present case does not involve a plaintiff who failed to discover *any* injury but, rather, a plaintiff who failed to discover the full extent of her injuries before the expiration of the statute of limitations." (Emphasis in original.) *Id.*; see also *Hutson v. Hartke*, 292 Ill. App. 3d 411, 415 (1997) (concluding that the plaintiff knew or should have known of her injuries in a case involving exposure to ammonia fumes and explaining that it was "sufficient that she experienced an identifiable episode which irritated her nose and throat and started a pattern of coughing that subsequently worsened and continued for weeks," even if she did not know the "full extent of the injury that the ammonia fumes would cause").

¶ 34        As the foregoing discussion illustrates, to say that the statute of limitations question does not turn on an official diagnosis does not end our inquiry. We must decide if the facts establish one way or the other that Solis knew or reasonably should have known that he was injured and that the injury was wrongfully caused–or if there is a factual question that should have gone to the jury. In this case, it is undisputed that plaintiff had some knowledge of an injury (a severe condition in his lungs) at least by 2004. Pulmonary function tests in 1999 and 2004 showed that Solis had decreased lung function. Between 2000 and 2004, Solis's symptoms were severe: he had several emergency room visits, coughing fits, and a period of hospitalization. After 2000, Solis recognized his symptoms as being "outside the ordinary, outside of asthma."

¶ 35        The central question here, as in many cases related to exposure to harmful substances, is whether Solis knew or should have known that those symptoms had a wrongful cause. On appeal, Solis contends that he simply thought he had asthma, even if severe, and never connected his condition to any wrongful cause. The term "wrongful cause" refers to the point in time when "the injured party becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1981). This standard "does not require knowledge on the part of plaintiff that the defendant's conduct fits the technical legal definition of negligence or that all the legal elements of a particular cause of action are otherwise satisfied." *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, ¶ 24. Instead, it is the reasonable knowledge of injury and its wrongful cause that imposes a "burden *** to investigate whether she has a viable cause of action." *Id.* ¶ 23; accord *Martin v. A&M Insulation Co.*, 207 Ill. App. 3d 706, 710 (1990). Additionally, this court has

recognized "that unless a clear definitive diagnosis is given by a doctor, in many instances it is a compilation or a series of statements, events or circumstances and thoughts that changes mere suspicion to reasonably knowing that a *** condition was wrongfully caused." *LaManna v. G.D. Searle & Co.*, 204 Ill. App. 3d 211, 219 (1990).

¶ 36    The evidence presented at trial reveals several indicators that before September 17, 2005, Solis had sufficient information about his injury and its cause to spark inquiry as to whether his injury might be legally actionable. In 2004, Flavorchem management invited doctors from NJH to do an assessment of the Flavorchem facility and workers' health at the plant. Solis testified that his understanding of the visit was that NJH was "doing some sampling" so that Flavorchem could get better ventilation and employees could get the correct respirators. As part of the visit, Solis received a pulmonary function test from NJH that showed decreased lung function, and Dr. Cecile Rose of NJH recommended that Solis be taken out of the dry mix area. Still, Solis testified that at this time, he did not have any idea than something at work could be causing his lung problems.

¶ 37    In December 2004, Solis went to meet with his pulmonologist, Dr. Sherman. Solis confirmed that he had "some discussion with [Dr. Sherman] about the fact that [he was] having some problems while [he] was at work with breathing." While Solis initially testified that he could not recall if Dr. Sherman asked any questions about "what kinds of exposures to various chemicals or fumes" Solis had at work, he then equivocated as to what he had told Dr. Sherman:

"Q. Did you tell Dr. Sherman that you were feeling worse at work, and that you thought it related to the kinds of things you were inhaling while you were working there?

A. I might, but I don't think so. I mean, by walking, I feel sick, you know, it trigger asthma [*sic*]. I mean, so I probably did. I'm not sure."

Sometime in late 2004 or mid-2005, Solis filled out a medical questionnaire in connection with the NJH visit. (A follow-up questionnaire has the marking "previous" followed by October 28, 2004 and May 2005, and Solis testified that the first questionnaire he filled out was probably from October 2004 or May 2005.) As part of the questionnaire, Solis was asked if there were particular tasks or processes in his job that he felt were likely to cause breathing problems, and he checked "yes." He also responded "yes" to the question "Are your symptoms worse at work?" Solis admitted that at the time he filled out this questionnaire, he felt that working around certain chemicals, including diacetyl, "caused [his] breathing problems."

¶ 38    When viewed in a light most favorable to BASF, the evidence[4] does not so

---

[4]While BASF cites to other records in its brief in support of its statute of limitations argument, these documents were simply attached to a previous summary judgment motion, and there is no indication that these documents were part of the evidentiary record. For example, BASF cites to a letter from Dr. Rose, dated June 2, 2005, explaining that NJH performed another medical screening in May 2005 as part of a "testing program *** to screen people for work-related lung disease." That letter apparently was not in evidence. BASF also cites to a November 5, 2004 letter from Dr. Sherman, which discusses "significant occupational history" and includes a handwritten

overwhelmingly favor Solis that no jury could have concluded that Solis did not know or should not have known of his lung condition's wrongful cause. More than one conclusion can be drawn from the evidence presented to the jury. We acknowledge that Solis testified that the first time he connected his lung condition to chemicals at work was in June 2006, when Dr. Rose told him that she was worried that he may have bronchiolitis obliterans from flavoring chemicals. But Solis's testimony must be placed in context of the evidence presented at trial. Before 2005, Solis's condition was growing significantly worse, a hospital group came to do a health assessment at Flavorchem, the hospital group tested the lung function of Solis and other employees, and Solis was told he could not work in the dry mix area. At trial, Solis confirmed that in late 2004 or mid-2005, he felt that certain chemicals caused his breathing problems, and his health questionnaire listed diacetyl as a chemical that was "likely to cause breathing problems." Solis's testimony–which itself is sometimes contradictory–either creates a factual dispute or raises questions about his credibility. "[W]here the resolution of factual disputes or the assessment of witness credibility is critical to the outcome of an action, a circuit court may not direct a verdict or grant a judgment notwithstanding the verdict." *Poulos v. Lutheran Social Services of Illinois, Inc.*, 312 Ill. App. 3d 731, 739 (2000) (citing *Maple*, 151 Ill. 2d at 454).

¶ 39    We acknowledge that "reasonable knowledge of wrongful cause requires more than a mere suspicion that wrongdoing might have occurred, if that suspicion is not yet supported by facts known to plaintiff." *Mitsias*, 2011 IL App (1st) 101126, ¶ 24. As this court has explained, however, the question is not simply what Solis knew, but what he should have known:

> "[W]hether a party possessed the requisite constructive knowledge contemplates an objective analysis of the factual circumstances involved in the case. Thus, the relevant determination rests on what a reasonable person should have known under the circumstances, and not on what the particular party specifically suspected. The trier of fact must examine the factual circumstances upon which the suspicions are predicated and determine if they would lead a reasonable person to believe that wrongful conduct was involved." *Young v. McKiegue*, 303 Ill. App. 3d 380, 390 (1999).

It is for the jury to determine whether Solis reasonably concluded that he simply had severe asthma from some non-occupational cause, or whether, based on the information he possessed, Solis should have inquired as to some possible fault on the part of the defendant. Where BASF presented some evidence that Solis knew or should have known of some possible fault on the part of BASF, it was error to direct a verdict in favor of Solis on the

---

note, "Diacetyl exposure @ work." Although the letter is included within Dr. Sherman's records admitted into evidence at a postverdict conference, BASF cites no testimony regarding the November 5, 2004 letter. In reviewing the trial court's directed verdict for Solis, entered just before closing arguments, we consider only the evidence adduced at trial. See *People ex rel. Reynolds v. Aldridge*, 107 Ill. App. 3d 679, 684 (1982) ("We find no merit in the State's argument that the trier of fact can be reversed by the trial judge on the basis of facts which were available at the time of trial but never proffered. The trial court is to base a judgment *n.o.v.* solely on the basis of evidence introduced at trial.").

statute of limitations question. See *Sekerez v. Rush University Medical Center*, 2011 IL App (1st) 090889, ¶ 59 (finding that trial court erred by directing a verdict on medical negligence claim where evidence was in conflict). When drawing all reasonable inferences in BASF's favor, the evidence did not "so overwhelmingly favor[] [Solis] that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Lazenby*, 236 Ill. 2d at 100. Accordingly, we reverse and remand for a new trial so that the jury can consider the statute of limitations question.

¶ 40                                        Causation: Proof of Exposure

¶ 41        BASF next contends that Solis's strict liability and negligence claims must fail because Solis did not prove that BASF was a "cause in fact" of his injuries. BASF argues that it is entitled to judgment *n.o.v.* on all claims. Alternatively, BASF argues that the verdict was against the manifest weight of the evidence, and we should therefore order a new trial. " 'A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' [Citations.]" *Maple*, 151 Ill. 2d at 454.

¶ 42        At issue here is whether Solis has presented sufficient evidence that BASF's diacetyl was a "cause in fact" of his injuries. Cause in fact can only be established when there is a reasonable certainty that a defendant's acts caused the plaintiff's injury. *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992). "It is axiomatic that liability cannot be premised merely upon surmise or conjecture as to the cause of the injury." *Id.* Causation in fact "is usually a question for the trier of fact." *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 355 (1992).

¶ 43        There are generally two tests used by courts to determine "cause in fact": the traditional "but for" test and the "substantial factor" test. *Id.* at 354. On appeal, the parties focus their arguments on the "substantial factor" test, by which the "defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." *Id.* at 354-55. In *Thacker*, our supreme court adopted the "frequency, regularity and proximity" test as a means by which an asbestos plaintiff can establish that a specific defendant's product was a substantial factor in being a cause in fact of a plaintiff's injury. Under that test, the plaintiff must prove that he was "exposed to the defendant's asbestos through proof that (1) he regularly worked in an area where the defendant's asbestos was frequently used and (2) the injured worker did, in fact, work sufficiently close to this area so as to come into contact with the defendant's product." *Id.* at 359. Our supreme court recently reaffirmed the use of this test in asbestos cases, but clarified that "the ultimate *burden of proof on the element of causation* remains exclusively on the plaintiff," and "*Thacker* creates no presumption on the issue of causation." (Emphasis in original.) *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 435 (2009).

¶ 44        To begin, we must address an issue that the parties brush aside rather quickly: whether *Thacker*'s "frequency, regularity and proximity" test applies in a case with allegations of occupational exposure to diacetyl, or whether that test is limited to asbestos exposure cases. For his part, Solis simply asserts, without discussion, that *Thacker* has no application beyond

asbestos cases. In reply, BASF contends that no Illinois authority limits *Thacker* to asbestos cases. The court in *Thacker* noted the "unique problems posed by asbestos injury" and identified several factors that led it to apply the "frequency, regularity and proximity" test in an asbestos case, many related to "how a plaintiff in an asbestos case can fairly meet the burden of production with regard to causation." *Thacker*, 151 Ill. 2d at 356-57 (noting, for example, that "a plaintiff injured by asbestos fibers often does not know exactly when or where he was injured and therefore is unable to describe the details of how such injury occurred").

¶ 45    The parties cite no authority to support their contentions regarding the applicability of the *Thacker* test to exposure cases like this one, nor do they discuss why it would be appropriate to apply that test in this case. Where the parties have failed to adequately address the issue, we will assume, but do not decide, that the test announced in *Thacker* applies to this case of occupational exposure to diacetyl. Compare *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 92 (2002) (declining to adopt the frequency, regularity and proximity rule and "depart from traditional concepts of causation" in a case involving environmental exposure, as opposed to asbestos exposure, because "[e]nvironmental exposure cases *** do not afford litigants the opportunity to specify with such certainty the exact level and dose of exposure" or "when or where exposure occurred"), *abrogated on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523 (2004), with *James v. Bessemer Processing Co.*, 714 A.2d 898, 911 (N.J. 1998) (discussing use of frequency, regularity, and proximity test in nonasbestos cases and ultimately "hold[ing] that a plaintiff in an occupational-exposure, toxic-tort case may demonstrate medical causation by establishing: (1) factual proof of the plaintiff's frequent, regular and proximate exposure to a defendant's products; and (2) medical and/or scientific proof of a nexus between the exposure and the plaintiff's condition"). Here it is enough to say that in *Nolan*, our supreme court explained that the frequency, regularity and proximity test, ultimately grounded in fundamental principles of tort law causation, does not alter the plaintiff's burden to prove causation:

"Although we noted [in *Thacker*] that asbestos plaintiffs face unique challenges in showing causation, we did not carve out an exception for asbestos cases which relieve those plaintiffs from meeting the same burden as all other tort plaintiffs. Rather, we adopted *Lohrmann*'s frequency, regularity and proximity test–tailored to application in asbestos actions–as a means by which a plaintiff choosing to prove cause in fact through use of the substantial factor test may meet that burden." *Nolan*, 233 Ill. 2d at 434.

¶ 46    Assuming that the frequency, regularity and proximity test applies here, we turn to BASF's argument that because it supplied such a small amount of diacetyl to Flavorchem, Solis could not prove that BASF's diacetyl was a substantial factor in causing Solis's injury. BASF argues that Solis's exposure to diacetyl supplied by BASF was "relatively insignificant" because BASF supplied as little as 3.5% of the diacetyl used in Flavorchem's powder room during the time Solis worked there. BASF points out that Solis was exposed to diacetyl from other suppliers, as well as other potentially harmful chemicals, during his employment at Flavorchem, Olmarc, and FONA.

¶ 47    Our supreme court encountered a similar argument in *Thacker*. There, the defendant

-13-

argued that it was entitled to a judgment *n.o.v.* on causation because the defendant supplied only a small amount of asbestos to the plant where decedent worked compared to the quantity of asbestos supplied to the plant from other sources. *Thacker*, 151 Ill. 2d at 355. The decedent had worked at the plant for eight years, and defendant had supplied asbestos for three of those years. *Id.* at 350. The plaintiff's expert testified that the decedent's disease may have been caused by any one, or any group, of the asbestos fibers inhaled by the decedent. *Id.* at 351. After adopting the "frequency, regularity and proximity" test for causation in fact, the court turned to the evidence before it as to the frequency of use:

> "[T]he evidence showed that [the decendent] worked in the UNARCO plant for more than eight years and that at least 75 tons of defendant's *raw* asbestos was processed at the plant during this time. The defendant notes in its brief that even under the most generous calculation, a maximum of just 3% of the total dust in the plant could have been generated from Manville asbestos and that the actual dust at the decedent's work site was, in all likelihood, significantly less. In light of plaintiff's medical evidence which indicated that even slight exposure would adversely affect the decedent's health, however, and in light of the total volume of asbestos at the UNARCO facility, we cannot say that 3% is insignificant as a matter of law." (Emphasis in original.) *Id.* at 360.

The court went on to explain that while the decedent testified that he could not remember ever working with defendant's asbestos, the plaintiff had presented sufficient evidence on "proximity" based on the ability of asbestos fibers to drift through the air. *Id.* at 364-65. The court concluded that the trial court properly denied defendant's judgment *n.o.v.*, and the verdict was not against the manifest weight of the evidence. *Id.* at 366.

¶ 48        As in *Thacker*, we cannot conclude that Solis's exposure to BASF diacetyl was insignificant as a matter of law. As to the frequency of use of BASF diacetyl, the batch records at Flavorchem show that BASF supplied *at least* 3.5% of the diacetyl used in the Flavorchem powder room during Solis's tenure. The 3.5% figure takes into account *no* BASF diacetyl supplied before 2003, even though BASF sold diacetyl to Flavorchem beginning in 2001. While BASF challenges the validity of Solis's testimony, Solis estimated that 50% of the diacetyl used in the plant was BASF diacetyl between 2000 and 2004. He testified that he arrived at this number because "most" of the drums he transferred were from BASF, and for "a whole bunch of formulas *** [he] was using the diacetyl."

¶ 49        Apart from Solis's testimony, Dr. Egilman testified that if he assumed that the BASF diacetyl in the plant was 2.5% to 3% of the diacetyl supplied to Flavorchem during the time Solis worked there, that amount would have been enough to cause the disease by itself, even "if it was his only exposure." In his opinion, this amount was "not trivial" and "by itself [was] enough to cause the disease" regardless of other exposures. Building on this conclusion, Dr. Egilman opined that exposure to BASF diacetyl was a substantial factor in causing Solis's disease. Under the principles announced in *Thacker*–left unaltered by *Nolan*–we conclude that plaintiff has presented competent evidence that BASF diacetyl was "frequently used" in the powder mix area.

¶ 50        Beyond the frequency requirement, there is no question that Solis regularly worked in the powder mix area in proximity to BASF diacetyl. Solis testified that from 2000 to 2004, he

-14-

used diacetyl on a daily basis in the powder mix area, and he remembered using BASF diacetyl after 2000. NJH found that the highest levels of diacetyl in the Flavorchem plant were in the dry mix or powder area, which is where Solis spent the majority of his time. Starting in 2003, when Flavorchem began to keep records of which diacetyl was used in which batch, Solis's initials appear on Flavorchem records next to particular batches with BASF-supplied diacetyl, meaning that Solis was either the compounder of those batches or he completed the computer work associated with those batches. The evidence presented at trial allowed for "a reasonable inference of substantial causation in fact." *Nolan*, 233 Ill. 2d at 434.

¶ 51 BASF points out that Solis had a respiratory injury before his first exposure to BASF's diacetyl, and Solis worked with diacetyl before starting at Flavorchem. As Dr. Parmet explained, Solis's gradual injury could be described as the result of "a continuing and ongoing exposure over the course of his employment." But again, Dr. Egilman testified that Solis's exposure to BASF diacetyl–without more–was enough to cause the disease. And Dr. Parmet, whose opinion linked Solis's condition more generally to flavoring chemicals rather than diacetyl alone, testified that he believed that "[d]iacetyl is the predominant chemical," even though it was "not the only one." Most importantly, Solis testified (and his experts and treating physicians confirmed) that as the diacetyl usage increased at Flavorchem after 2000–during the time when BASF was supplying diacetyl to Flavorchem–Solis's condition deteriorated rapidly. A lung function comparison from 1999 to 2010 showed that Solis lost about 600 to 700 cubic centimeters of lung capacity, which was 2 to 3 times more loss than normal. Dr. Egilman noted that the 10% loss of lung function between 2000 and 2009 was significant because Solis was at a "risk of death" if he contracted a cold, cough, small virus, or an infection. Dr. Parmet testified that Solis's symptoms were "manageable" prior to 2000, but became worse after 2000: Solis had more emergency room visits, more coughing fits, coughing episodes that led to loss of consciousness, a decrease in pulmonary function, and a period of hospitalization. It is not as if the "damage was done" by the time Solis began to work with BASF diacetyl; there was evidence that additional exposure to diacetyl caused further deterioration of the lungs.

¶ 52 We note that BASF was not prevented from challenging Solis's experts' opinions or inquiring about Solis's other exposures. Following *Nolan*, the trial court allowed BASF to "explore other exposures" at FONA and Olmarc so that the jury could "determine what, if any, of those exposures were the sole proximate cause" or that "those exposures were just an additional cause for [Solis's] illness." While we acknowledge that the evidence suggested that there were other contributing factors to Solis's injury, BASF is " 'liable for [its] negligent conduct whether it contributed wholly or partly to the plaintiff's injury as long as it was one of the proximate causes of the injury.' " (Emphasis omitted.) *Nolan*, 233 Ill. 2d at 440 (quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 93 (1995)). We conclude that Solis presented enough evidence of frequent, regular, and proximate exposure to BASF diacetyl to present the question of causation to the jury. Moreover, because the findings of the jury were supported by the evidence and not unreasonable or arbitrary (*Maple*, 151 Ill. 2d at 452), we conclude that the jury's verdict was not against the manifest weight of the evidence.

¶ 53    We must address one final argument from BASF as to "insufficient exposure." BASF argues that the trial court erred in allowing Solis's experts to testify as to their conclusions regarding the cause of Solis's injury. BASF acknowledges that an expert may offer opinion testimony regarding the ultimate issue in a case. *Richardson v. Chapman*, 175 Ill. 2d 98, 107 (1997). This testimony does not usurp the province of the jury because the jury is not required to accept the expert's opinion. *Id.*; see also *Pyskaty v. Oyama*, 266 Ill. App. 3d 801, 820 (1994) (finding no error in allowing expert to testify regarding causation). BASF claims, however, that Dr. Egilman's testimony was contrary to the standard for causation set forth in *Thacker* because he asserted that *any* and *every* exposure, no matter how small, was a substantial factor in bringing about his injury. We take a different view of Dr. Egilman's testimony. As noted above, Dr. Egilman testified that if he assumed that BASF supplied 2.5% to 3% of the diacetyl to Flavorchem at the time Solis worked there, that amount, alone, was enough to cause his disease. On cross-examination, Dr. Egilman made clear that it was *not* his conclusion that every exposure, no matter how small, was a "substantial factor" in causing Solis's injury. He explained that there was a "*de minimus*" exposure level, which he marked at "less than one part of a billion total exposure," though "exposure that's 2 to 1 percent, 5 percent to 10 percent [would be] a significant contributing factor if the total exposure is 100."

¶ 54    Without mentioning any of the above statements, BASF points to a single statement from Dr. Egilman–among his hundreds of pages of testimony–to support the argument that Dr. Egilman professed an "any exposure is a substantial factor" theory. On redirect examination, Dr. Egilman testified regarding his opinion that BASF failed to release the LC50 study. His counsel then asked about his views of the significance of not releasing that study:

> "Q. Your view regarding the publication of this study has not changed since you became aware that they did not release this to the public?
>
> A. That's correct.
>
> Q. And do you believe it's a substantial contributing factor to Mr. Solis's disease regardless of how much BASF diacetyl he was exposed to?
>
> A. Yes."

We view this testimony as expressing Dr. Egilman's opinion that BASF's failure to release the LC50 study to Flavorchem contributed to Solis's injury. We note that labeling BASF's alleged failure to warn as a "contributing factor," regardless of how much BASF diacetyl Solis was exposed to, is particularly confusing. That testimony is also contrary to the requirement that Solis must prove that he was exposed to more than a *de minimus* amount of BASF diacetyl in order to prevail on all of his negligence and strict liability claims. This particular testimony from Dr. Egilman should not be repeated on remand. Based on our review of Dr. Egilman's entire testimony, however, we conclude that his opinion on causation was not contrary to the requirement set forth in *Thacker* or *Nolan*.


¶ 55                        Causation: Failure-to-Warn Claims

¶ 56    BASF next argues that it is entitled to a judgment *n.o.v.* because Solis failed to prove proximate causation on his failure-to-warn claims sounding in negligence and strict liability.

To prove these claims, Solis had to show (1) that BASF failed to disclose or instruct about a danger of diacetyl, and (2) that this failure to disclose proximately caused his injuries. See *Salerno v. Innovative Surveillance Technology, Inc.*, 402 Ill. App. 3d 490, 498 (2010) (strict liability failure to warn); *Kane v. R.D. Werner Co.*, 275 Ill. App. 3d 1035, 1037 (1995) (negligent failure to warn). BASF contends that Solis's claims fail on the second element, because Solis admitted that he never read any BASF warnings for diacetyl while at Flavorchem.

¶ 57     In failure-to-warn cases, "it has been held that there must be sufficient evidence supporting a reasonable inference, rather than a guess, that the presence of adequate warnings would have prevented the plaintiff's injuries." *Broussard v. Houdaille Industries, Inc.*, 183 Ill. App. 3d 739, 744 (1989); see also *Brobbey v. Enterprise Leasing Co. of Chicago*, 404 Ill. App. 3d 420, 433 (2010) (question of proximate cause is ordinarily one for the jury). In *Kane v. R.D. Werner Co.*, 275 Ill. App. 3d 1035 (1995), this court held that a plaintiff who does not read an allegedly inadequate warning cannot maintain a product liability action premised on a failure-to-warn theory, unless the nature of the alleged inadequacy is such that it prevents him from reading it. *Kane*, 275 Ill. App. 3d at 1037. The *Kane* plaintiff, injured in a fall from a ladder, alleged that the defendant manufacturer had failed to warn of the ladder's various "dangerous propensities" on the warning label attached to the ladder. *Id.* at 1035-36. Because the plaintiff admitted that he had never read the warning labels, the appellate court agreed with the trial court that the plaintiff had failed to show that the warning labels on the ladder were the proximate cause of his injury. *Id.* Drawing from a decision of the Alabama Supreme Court, the appellate court reasoned that the plaintiff " 'could have read this allegedly inadequate, unspecific warning as easily as he could have read an adequate, specific warning. And, no amount of specificity would have protected this plaintiff, because he would not have read a warning.' " *Id.* at 1037 (quoting *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 971 (Ala. 1985)). In other words, even if the warning were adequate, the plaintiff would have been in no better position, and thus the failure to warn did not cause any injury to him.

¶ 58     While we do not quarrel with the statement of law underlying BASF's argument, we cannot agree that any improvement in the warnings BASF provided to Flavorchem would have been overlooked by Solis. BASF essentially asks the court to draw only one factual inference from the evidence: if BASF had disclosed the study to Flavorchem, that information would have been communicated solely through a revision in the MSDS, without any accompanying announcement, and that revision would have gone unnoticed by Solis. The evidence, when viewed in a light most favorable to Solis, does not lead to that single factual conclusion.

¶ 59     At Flavorchem, Solis was responsible for giving employees instruction on where to access MSDSs, and he would sometimes read various MSDSs with employees so that they had "some understanding" of what the warnings said. When Solis was asked if he read any MSDSs on diacetyl at Flavorchem, Solis explained that "[t]here was no need" because he had read "a lot of MSDSs" at FONA, including MSDSs for the diacetyl. Solis explained that based on this knowledge, he did not have any questions about the MSDSs for diacetyl and did not review them. Other testimony from Flavorchem employees establishes that BASF's

disclosure of the LC50 study to Flavorchem would have caused Solis to review the MSDS for diacetyl or would have otherwise triggered his awareness of the study. The president of Flavorchem, Malinowski, testified that during Solis's tenure, the company was "proactive at the time in dealing with diacetyl" and had meetings with employees, including Solis, about how to handle diacetyl. Malinowski suggested that Flavorchem would have investigated whether Solis and other employees should wear additional protective gear when using diacetyl. As to the MSDS, Dianne Hamernick, a Flavorchem employee, specifically testified that if Flavorchem had obtained the study as of 2001, it would have taken action to change the MSDS:

"Q. If you had that study with all of those words that listed bloody edema, atelectasis, hyperemia, all of those things that we just looked at, would that have changed what you put on the Flavorchem MSDS in any way?

A. We would have brought that up to Orr Safety and seen if additional personal protective equipment was needed and then, in turn, updated the MSDS–

\* \* \*

Q. In terms of what you would have put on the MSDS you would have relied on Orr Safety and those things would not have changed what you yourself put on there; is that right?

A. Well, we would have updated it or changed it."

What the evidence reveals is that Flavorchem communicated with employees about how to handle diacetyl, and if given the study, Flavorchem would have updated and changed the MSDS and possibly changed the protective equipment required to handle diacetyl. While Solis did not repeatedly review the MSDSs for diacetyl because he felt familiar with the information provided in them, we conclude that, in view of the evidence, the jury could have rationally concluded that Solis would have become aware of the additional information from the LC50 study if BASF had supplied that information to Flavorchem. The jury's finding on proximate cause as to the failure-to-warn claims was not "so palpably erroneous as to warrant a different result." *Lee*, 152 Ill. 2d at 456.

¶ 60 BASF also argues that the jury should have been specifically instructed that if Solis did not read the available warning, the alleged failure to warn did not proximately cause his injury. The trial court has discretion to determine which instructions to give the jury and that determination will not be disturbed absent an abuse of that discretion. *People v. Simms*, 192 Ill. 2d 348, 412 (2000). The standard for deciding whether a trial court abused its discretion is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002).

¶ 61 Here, where the jury was properly instructed that Solis was required to prove proximate causation, the jury was apprised of the relevant legal principles, and BASF's additional instruction would have been redundant. Moreover, as the foregoing discussion illustrates, the proposed instruction may have been confusing to the jury in light of the evidence before it. This was not a simple case where Solis's admission that he did not read MSDSs for diacetyl while at Flavorchem foreclosed his ability to prove causation. There was evidence suggesting

-18-

that a change in the BASF MSDS would have triggered action by Flavorchem and caused Solis to review the MSDS. BASF certainly could (and did) challenge the inferences to be drawn from the evidence, arguing to the jury that Solis would never have seen any change in BASF's MSDS for diacetyl. Where the jury was otherwise properly instructed on Solis's burden to show proximate cause on the failure-to-warn theory, however, the trial court did not abuse its discretion in denying BASF's proposed instruction.

¶ 62                    Negligence: Scope of BASF's Duty to Warn

¶ 63    BASF next argues that the jury received an improper instruction on the failure-to-warn claim sounding in negligence. The court instructed the jury that "Gerardo Solis claims that he was injured and sustained damage and that BASF Corporation was negligent in one or more of the following respects: *** in failing to disclose the results of scientific research available to it indicating that the use of diacetyl causes lung disease or risk of harm to others." BASF argues that the instruction imposed an expansive duty on BASF to warn the flavoring industry (or the world) about diacetyl's risks, rather than those to whom BASF distributes its product. The parties agree that Solis's first potential exposure to BASF diacetyl was in 2001, when BASF first distributed diacetyl to Solis's employer, Flavorchem. According to BASF, the instruction allowed the jury to fault BASF for failing to disclose the study to the industry before 2001 because the instruction referenced "a duty to disclose" without specifying that BASF only had a duty to disclose to those who receive BASF distributed products.

¶ 64    The imposition of a duty to warn depends on whether BASF and Solis stood in such a relationship to each other that the law imposed upon BASF an obligation of reasonable conduct for the benefit of Solis. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987). The parties agree that BASF had a duty to warn the users of its products of the dangers of diacetyl. See *Venus v. O'Hara*, 127 Ill. App. 3d 19, 23 (1984) ("[F]ailure to warn of a product's dangerous propensities may be a basis for strict liability in tort [citation] and that strict liability therefore may be imposed upon all parties within the chain of distribution, including suppliers, distributors, wholesalers, and retailers [citation]."); *Riordan v. International Armament Corp.*, 132 Ill. App. 3d 642, 647-48 (1985) (noting that distributor may be liable for failure-to-warn claim sounding in negligence (quoting Restatement (Second) of Torts § 388 (1965))); *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 265 (1990) (noting that "[e]ach manufacturer owes a duty to plaintiffs who will use its drug or be injured by it" but "the duty is not so broad as to extend to anyone who uses the type of drug manufactured by a defendant"). The parties also agree that because BASF Corporation distributed diacetyl to Flavorchem starting in 2001, it had a duty to warn Flavorchem–and by extension Solis–of the LC50 study as of that date.

¶ 65    The question is whether the relationship between BASF and Solis's pre-2000 employers was such that BASF had a duty to disclose its LC50 study to those employers. There is no suggestion on appeal that BASF supplied diacetyl to either of Solis's previous employers, Olmarc or FONA, so there must be some other basis for imposing a duty that runs to the benefit of Solis. On appeal, Solis offers none. Solis (somewhat puzzlingly) argues that the

instruction given properly reflected BASF's duty to disclose the study to Flavorchem, "among others." Unfortunately, Solis presents no argument–much less any applicable authority–to support a finding that BASF had a duty to disclose the scientific study to those companies working with diacetyl not distributed by BASF. See *Brewster v. Rush-Presbyterian-St. Luke's Medical Center*, 361 Ill. App. 3d 32, 35-36 (2005) (reciting four-factor test for deciding whether a duty of care exists (citing *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 391 (2004))); *cf. Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987) (no duty to warn running from doctors to general public who might come in contact with doctor's patient). The only case that Solis cites as support that the instruction was "proper" is *Elam v. Lincoln Electric Co.*, 362 Ill. App. 3d 884 (2005), but in that case the court recognized a manufacturer's duty to warn the users of its welding rods, where the plaintiff had used welding rods made by the defendant for 30 years. See *Elam*, 362 Ill. App. 3d 884. We note that the jury was properly instructed, on the strictly liability failure-to-warn claim, that "BASF Corporation had a duty to adequately warn and instruct *the user* about the dangers of its product ***." (Emphasis added.) Where Solis presents no authority for some expanded duty, we can only presume that Solis means that BASF had a duty to disclose the study to those to whom it distributes its products, including Flavorchem.

¶ 66 We are left to consider whether the instruction given properly informed the jury that BASF's duty to disclose the study to Flavorchem as of 2000, when it first began distributing its product to Flavorchem. Given the unique facts of this case, that instruction did not fairly, fully, and comprehensively apprise the jury of the relevant legal principles. *Schultz*, 201 Ill. 2d at 273-74.

¶ 67 BASF contends that the instruction, without mentioning to whom the duty ran, expanded the concept of duty to the entire flavoring industry, if not the general public. Under the facts of this case, the court should state, specifically, that BASF's duty to disclose ran to those who use the products that BASF distributes. The jury heard testimony that two industry groups, FEMA and RIFM, did not have the LC50 study until after 2000, but if they had been provided the LC50 study in the late 1990s, they would have disseminated the information to diacetyl users. Solis's counsel solicited testimony from Solis's expert witnesses that if BASF had "come forward with this information they had in their animal study, *** the medical and scientific community could have discovered the causal association in 1995 rather than 2002." With that evidence before the jury, and with the instruction given, there was a unique risk that the jury would conclude that BASF had a duty to warn the entire flavoring industry.

¶ 68 BASF next argues that the instruction allowed the jury to fault BASF for failing to disclose the LC50 before BASF could have possibly became aware of the contents of that LC50 study before 2001. According to BASF, the instruction allowed Solis to "impute" AG's knowledge to BASF. To prove a product defect claim based on a defendant's failure to warn, a plaintiff must show "that the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity." *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 96 (2005); accord *Baltus v. Weaver Division of Kidde & Co.*, 199 Ill. App. 3d 821, 830 (1990). The trial court instructed the jury that BASF had a duty to warn with information "available to it." While this language comes close to the appropriate standard, we think the

language too inexact in light of the facts of this case. Again, we note that the trial court properly instructed the jury on the strict liability failure-to-warn claim, explaining that "BASF Corporation has a duty to adequately warn and instruct the user about the dangers of its products of which it knew, or in the exercise of ordinary care, should have known, at the time the product left its control." On remand, the court should provide a similar instruction with regard to the negligent failure-to-warn claim, explaining that BASF only had a duty to disclose scientific information that it knew or should have known.

¶ 69                                  Strict Liability: Diacetyl as Unreasonably Dangerous

¶ 70       BASF argues that Solis failed to prove that "BASF Corporation-supplied diacetyl" was unreasonably dangerous. In a strict product liability action, "[a] product may be found unreasonably dangerous by virtue of a physical flaw, a design defect, or a failure of the manufacturer to warn of the danger or instruct on the proper use of the product as to which the average consumer would not be aware." *Sollami v. Eaton*, 201 Ill. 2d 1, 7 (2002) (citing *Renfro v. Allied Industrial Equipment Corp.*, 155 Ill. App. 3d 140, 155 (1987)). At BASF's request, the trial court instructed the jury that "[a] product bearing an adequate warning is not defective, nor is it unreasonably dangerous." To find in favor of Solis on the strict liability claims, then, the jury had to conclude that BASF's warning was inadequate.

¶ 71       A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal knowledge with respect to the risk of harm, and the manufacturer or distributor, possessed of such knowledge, knows or should know that harm may occur absent a warning. *Sollami*, 201 Ill. 2d at 7. The Restatement (Second) of Torts explains that "a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized." Restatement (Second) of Torts § 402A cmt. j, at 353 (1965) (explaining that "dangers of alcoholic beverages" are "generally known or recognized"). Where the product is defectively designed or manufactured or where the possibility of injury results from a common propensity of the product that is not obvious to the user, however, the manufacturer or distributor must provide an adequate warning. *Sollami*, 201 Ill. 2d at 20 (citing *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 467 (1976)). A product bearing such a warning "is not in defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 402A cmt. j, at 353 (1965).

¶ 72       In this case, the question for the jury was whether diacetyl itself was "unreasonably dangerous" because it failed to contain a warning apprising Flavorchem and Solis of the dangers of diacetyl. The nature of Solis's claim was that BASF's MSDS was inadequate because it labeled diacetyl as "moderately toxic" and failed to disclose that exposure to high concentrations of diacetyl could cause bronchiolitis obliterans. On appeal, BASF does not claim that the potential for injury with high exposures was generally known and recognized by those using diacetyl. Instead, BASF again argues that Solis failed to prove that he was exposed to BASF-supplied diacetyl that exceeded a threshold "safe level." In other words, BASF simply repeats the argument that Solis failed to prove that he was exposed to more

than a *de minimus* level of BASF's diacetyl. We have already addressed, and rejected, that argument. Where BASF presents no other challenge with regard to the strict liability claims, we find no error in submitting those claims to the jury.

¶ 73                                    Evidentiary Errors

¶ 74    Although we have determined that this case must be remanded for a new trial, BASF raises a number of claims of evidentiary error that are likely to arise again on remand. In the interest of judicial economy, we address the specific evidentiary issues likely to recur on remand. See *Petre v. Kucich*, 331 Ill. App. 3d 935, 944 (2002). A trial court's decision regarding whether to admit evidence is reviewed for abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993).

¶ 75            *Subsequent Remedial Measures: Changes to BASF's MSDS*

¶ 76    BASF first argues that it was improper for the trial court to admit evidence that after Solis left Flavorchem, BASF revised its MSDS to include a specific mention that overexposure to high levels of diacetyl may be associated with bronchiolitis obliterans. Evidence of postaccident remedial measures is inadmissible to prove prior negligence. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300 (1995). Evidence of subsequent remedial measures may be used for impeachment purposes, however, so long as the value of the impeachment does not rest on an "impermissible inference *** of prior negligence." *Id.* at 301.

¶ 77    We agree with Solis that the 2006 MSDS was properly used to impeach Dr. Weill, an expert witness for BASF who testified that "it was not scientifically proven that diacetyl could cause bronchiolitis obliterans" and "[t]he association between butter flavoring and bronchiolitis obliterans is unproven." When asked on cross-examination if he was aware that BASF's 2006 MSDS states that "[o]verexposure to high concentration may cause pulmonary irritation that could be associated with lung disease (bronchiolitis obliterans)," Dr. Weill admitted that he was not aware of this statement. BASF did not object to this testimony at trial and fails to address it on appeal.[5]

¶ 78    Despite Solis's claim that the MSDS was used to impeach other BASF witnesses, the record shows that the 2006 MSDS was not used for impeachment with at least three witnesses: Julie Klees, the associate medical director at BASF; Ralph Parod, a toxicologist at BASF; and Louise Noell, product regulatory manager at BASF. None was asked whether exposure to diacetyl caused bronchiolitis obliterans before being questioned about the revisions to the MSDS; instead, each witness was presented the 2006 MSDS and simply

---

[5]We are particularly troubled that in discussing whether the 2006 MSDS was used for impeachment, BASF represented that Solis's counsel never even attempted to impeach BASF's experts with the 2006 MSDS. This is not true. In its brief, BASF provides record citation to the testimony of two of three expert witnesses, but provides no mention of BASF's third expert witness, Dr. Weill. It is difficult to place an innocent construction on this crucial omission.

asked to confirm that BASF had changed it.[6] While we agree that the 2006 MSDS could be used for impeachment for any witness who denied that diacetyl could cause bronchiolitis obliterans, the MSDS was not properly used to impeach these witnesses.

¶ 79    We turn to Solis's alternative argument, raised for the first time on appeal, that the change in the MSDS was admissible because BASF did not act voluntarily, but was required to act by an outside governmental authority. See, *e.g.*, *Bulger v. Chicago Transit Authority*, 345 Ill. App. 3d 103, 110 (2003); *LoCoco v. XL Disposal Corp.*, 307 Ill. App. 3d 684, 693 (1999); *Gaunt & Haynes, Inc. v. Moritz Corp.*, 138 Ill. App. 3d 356, 365 (1985) (finding that postlawsuit change to entrance was "not a voluntary act" because it was required by Department of Transportation order). Solis claims that the OSHA Hazard Communications Standard (29 C.F.R. § 1910.1200(a) *et seq.*) requires chemical manufacturers to post new information regarding hazards posed by a chemical within three months of the receipt of the information, and BASF's changes to its MSDS therefore was not a voluntary act, but was required by government authority. We disagree. First, we question whether BASF, as a distributor, was under an obligation to act under the specific provisions that Solis identifies, which Solis asserts apply to manufacturers. Second, there is no testimony from BASF personnel that BASF revised its MSDS pursuant to mandatory OSHA requirements or any other outside government authority. The impetus for the changes appears to be correspondence from the California Department of Health Services in May 2006 recommending revisions to the MSDS for diacetyl, and Solis points to no testimony showing that the California department did (or could) mandate a change to BASF's MSDS. Where no testimony establishes that BASF's action was not a voluntary, discretionary act, any use of the 2006 MSDS for purposes other than impeachment was improper.

¶ 80                                   *Hearsay Documents*

¶ 81    BASF argues that several documents were improperly admitted into evidence. BASF contends that these documents are hearsay and not admissible under any exception to the hearsay rule.

¶ 82    BASF first challenges the admission of a case report authored by Dr. Yadava, Solis's treating pulmonologist, and a number of other physicians, which was published in a medical journal between the time of the filing of the lawsuit and trial. We agree with BASF that was

---

[6]By contrast, other BASF witnesses agreed that diacetyl was harmful to the lungs and could cause bronchiolitis obliterans without reference to the 2006 MSDS. For example, Patrick Conner, a medical director for BASF, testified that he understood that diacetyl has "toxicity to the lungs," based on his review of a study by Dr. Price at NIOSH that found that "bronchiolitis obliterans was being caused in workers overexposed to diacetyl." Similarly, Pherne Lewis agreed that diacetyl can cause "serious lung disease." Even Julie Klees, who was questioned about the 2006 MSDS, agreed that "overexposure to high concentrations of diacetyl may cause pulmonary irritation that could be associated with lung disease such as bronchiolitis obliterans."

error to admit the case report as substantive evidence at the postverdict exhibit conference.[7] The trial court's stated grounds for admitting it–that it was a "document authored by this particular witness"–is not a recognized hearsay exception.

¶ 83    Solis argues that it was nonetheless proper for Dr. Yadava to refer to the report during his testimony because Yadava reasonably relied on the report to explain the basis for his opinion. "[T]he underlying facts or data upon which an expert in a particular field is found to have reasonably relied are not admitted for their truth. The underlying facts or data are admitted 'for the limited purpose of explaining the basis for the expert witness' opinion.' " *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185 (1990) (quoting *People v. Anderson*, 113 Ill. 2d 1, 12 (1986)). The record shows that the case report was not used to explain the basis for Yadava's opinion; the published article simply rehashed and confirmed Yadava's testimony. The case report's only purpose was to bolster Yadava's opinion testimony by showing that he (and other doctors) had previously reached the same conclusion in a case report that was accepted and published in a medical journal. Use of the case report for this purpose was improper. See *People v. Prince*, 362 Ill. App. 3d 762, 776 (2005) (concluding that expert's testimony that her work was "peer reviewed and verified by another researcher" was improper, where there was no testimony that expert relied on opinions of others in forming an opinion, and noting that "the peer review or verification necessarily takes place after the expert has already done his or her work"); Michael H. Graham, Graham's Handbook of Illinois Evidence § 703.1, at 685 (10th ed. 2010) ("[T]he content of the published material to be read to the jury must be reasonably relied upon as a basis for the expert's opinion, not merely to corroborate that opinion."). It was error to question Dr. Yadava about his published article, where the only function was to bolster his opinion testimony.

¶ 84    BASF also challenges the admission of two letters sent to Dr. Yadava by two physicians who also examined Solis: Dr. Gottschall of National Jewish Hospital in Denver, Colorado, and Dr. Orris. Both letters recounted the doctors' views of Solis's condition and his work history, and in the letters, both physicians concluded that Solis's bronchiolitis obliterans was induced by his work with diacetyl. The trial court admitted both as substantive evidence, over objection. In a postverdict conference, the court ruled that the letter from Dr. Gottschall to Dr. Yadava was a medical record, and the trial court admitted the Orris letter during trial

---

[7]The trial court held a conference to admit several exhibits into evidence several weeks after the jury returned its verdict. While the parties apparently agreed that no exhibits would go back to the jury unless it requested a specific exhibit (which the jury did not), we find it troublesome that the court ruled on the admissibility of the documentary exhibits after the verdict. The exhibits considered at the conference were either read into the record or displayed to the jury during witness testimony. We question how the trial court could rule, over objection, that a particular document could be shown or read to the jury, but the court could later conclude, based on argument after the verdict, that the document was "inadmissible." For example, at the postverdict conference there were several objections based on hearsay and foundation; if any of these documents lacked foundation or were hearsay, they should not have been presented to the jury during trial. A document's admissibility, the basis for its admission, and any appropriate limiting instruction should be ruled upon during trial, not after the verdict.

after a conversation took place off the record.

¶ 85    "Medical records are *** admissible in Illinois courts as long as a sufficient foundation is laid to establish that they are business records." *Troyan v. Reyes*, 367 Ill. App. 3d 729, 733 (2006); see also Ill. R. Evid. 803(6) (eff. Jan. 1, 2011). "Satisfying foundational requirements to admit business records requires that the party tendering the record establish that the record was made in the regular course of business at or near the time of the event or occurrence." *Werner v. Nebal*, 377 Ill. App. 3d 447, 457 (2007); *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 414 (2005). Any person familiar with the business and its mode of operation may provide testimony establishing the foundational requirements of a business record. *In re Marriage of Fields*, 283 Ill. App. 3d 894, 905 (1996).

¶ 86    Dr. Yadava explained that he referred Solis to two specialists, Dr. Gottschall and Dr. Orris, and those doctors reported back to him in writing. Dr. Yadava certainly received the doctors' reports in the regular course of his practice, as necessary to fashion a proper course of treatment for Solis, and he was, of course, familiar with his practice and its mode of operation. Although we recognize that Dr. Gottschall and Dr. Orris did not make their records in the regular course of Dr. Yadava's medical practice, the incorporation of those letters into Dr. Yadava's course of treatment is enough to satisfy the business records exception. "Where a third party is authorized by a business to generate the record at issue, the record is of no use to the business unless it is accurate and, therefore, the record bears sufficient indicia of reliability to qualify as a business record under the hearsay rule." *Argueta v. Baltimore & Ohio Chicago Terminal R.R. Co.*, 224 Ill. App. 3d 11, 20-21 (1991). While we acknowledge that "a person receiving a document from a business could not solely by virtue thereof lay a sufficient foundation for admitting the document," there is an exception where "the business receiving the information, acting in the regular course of business, integrates the information received *** and relies on it in its day-to-day operations." Michael H. Graham, Graham's Handbook of Illinois Evidence § 803.6 (10th ed. 2010) (collecting cases). The trial court did not abuse its discretion in admitting the reports sent to Dr. Yadava.

¶ 87    The next document at issue is a handwritten note that Solis received from Dr. Rose at NJH, which stated "I am worried that you may have bronchiolitis obliterans (BO) from flavor chemicals." Solis testified about the note, explaining that he asked Dr. Rose to write down the diagnosis so that he could remember the name "bronchiolitis obliterans." BASF forfeited this objection for review because it did not object to Solis testifying about the note. See *Stapleton v. Moore*, 403 Ill. App. 3d 147, 156 (2010). Moreover, at trial BASF did not dispute that the document was not offered for the truth of the matter asserted, but was used to show that Solis was on notice of his diagnosis. See *Brawner v. City of Chicago*, 337 Ill. App. 3d 875, 888 (2003) (When "out-of-court statements are offered to prove their effect on a listener's mind or to show why the listener subsequently acted as he did, they are not hearsay and are admissible."). The Department of Labor questionnaire, in which Dr. Yadava provides a summary of Solis's medical condition, was not admitted into evidence until the postverdict conference. At the conference, Solis's counsel informed the trial court that Dr. Yadava had testified regarding the document. In fact, Dr. Yadava did not provide any testimony about the document, and Solis references no other testimony that would establish

a foundation for admitting the document as a medical record. The questionnaire should not have been admitted as substantive evidence.

¶ 88                                    *AG's German MSDS*

¶ 89        BASF next challenges the trial court's decision to admit an MSDS apparently created by BASF's German parent company, AG, in 1996 (German MSDS). AG's German MSDS used the words "harmful by inhalation," but BASF's MSDS did not. Solis argues that it was improper for Solis to question Julie Klees and Ralph Parod about the German MSDS, display the German MSDS to the jury, and then admit the German MSDS into evidence, where Solis called no witness to lay a foundation for the German MSDS and simply asked BASF witnesses to compare the language in the German MSDS to BASF's MSDS. (BASF explains that BASF produced a copy of the German MSDS to Solis's counsel during discovery in another lawsuit.) Solis acknowledges that a proponent of documentary evidence must lay a foundation for its introduction by showing that record was made in the regular course of business and that the record is what it is claimed to be. See, *e.g.*, *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35, 42 (2000) (citing Michael H. Graham, Cleary & Graham's Handbook of Illinois Evidence § 901.1 (7th ed. 1999)); *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 415 (2005). But on appeal, Solis references no testimony that explains how the German MSDS was created or otherwise provides any foundation for using it to cross-examine fact witnesses. As noted above, in the absence of evidence regarding the circumstances of a document's creation, "the business records exception is not justified merely by evidence regarding the practice of the document's retention." *Apa v. National Bank of Commerce*, 374 Ill. App. 3d 1082, 1088 (2007). Questioning Klees and Parod about the German MSDS, without laying a sufficient foundation, was improper.

¶ 90                                    *Solis's Calculations*

¶ 91        BASF next challenges the trial court's decision to allow Solis to testify regarding calculations he made about BASF's sales of diacetyl to Flavorchem. On redirect examination, Solis pulled a piece of paper out of his pocket and explained that he had calculated how much diacetyl BASF supplied to Flavorchem. He based his calculations, done over lunch apparently without the knowledge of his attorneys, on Flavorchem purchase records he saw on counsel's table. (It is unclear if the purchase records had previously been admitted into evidence.) These records extended from 1998 to 2006 and included all sales of diacetyl, without distinguishing whether the diacetyl was used in the powder room and liquid room.

¶ 92        On appeal, Solis contends that the records were properly used as a "demonstrative aid" for his testimony. Solis's calculations were not used to explain or illustrate this testimony, however; he testified that he had no knowledge of the information contained in the records before he found them on counsel's table. Solis had previously testified that he believed that BASF supplied 50% of the diacetyl Flavorchem used between 2000 and 2004, but that estimate was based on his encounters with BASF diacetyl at the Flavorchem facility. Solis used the record he found in an attempt to reinforce his testimony, not illustrate it. Solis could

offer no definitive testimony about what information was contained in the records, and he could not lay a proper foundation to establish that the records were what he claimed them to be. See *Anderson*, 314 Ill. App. 3d at 42. The manner in which Solis attempted to inject the sales information at trial was improper.

¶ 93                                          *Improper Expert Testimony*

¶ 94        We have already addressed some of BASF's complaints regarding the testimony of Solis's experts regarding causation. BASF also argues that Dr. Egilman improperly testified that BASF may have indirectly supplied diacetyl to FONA. Over objection, Dr. Egilman testified BASF may have supplied diacetyl to C&A, and C&A supplied diacetyl to FONA. Dr. Egilman then went on to opine that even though he could not trace how much, if any, BASF diacetyl Solis was exposed to at FONA, BASF could have prevented Solis's injuries if it had adequately warned FONA about the harmful effects of diacetyl. On cross-examination, Dr. Egilman admitted he did not know whether C&A sold any BASF diacetyl to FONA. It is well established that "expert opinions based upon *** guess, speculation, or conjecture as to what *** might have happened are inadmissible." *Modelski v. Navistar International Transportation Corp.*, 302 Ill. App. 3d 879, 886 (1999). It was improper to allow Dr. Egilman to testify about a wholly speculative link between BASF diacetyl and FONA and to further testify that based on that supposed link, BASF's failure to warn FONA contributed to Solis's injury.

¶ 95                                 *Exclusion of Statute of Limitations Evidence*

¶ 96        BASF next argues that the trial court improperly barred BASF from questioning Solis about his statements in medical records kept by his physician, Dr. Sherman. On cross-examination, counsel for BASF questioned Solis about a meeting he had with Dr. Sherman. When Solis testified that he could not remember the meeting, counsel then attempted to refresh Solis's recollection with Dr. Sherman's records:

    "Q. Did you tell Dr. Sherman, on December 15, 2004, that you had exposures to chemicals and fumes while you were at work. Does that help you with that?

    A. I don't think so, no.

    Q. Okay. You don't remember?

    A. I don't remember.

    Q. All right. You don't dispute what he says in the record?

    [Solis's Counsel]: Your Honor, the record–I don't think it can be used that way.

    THE COURT: Sustained."

BASF did not pursue the line questioning. BASF apparently relied on an entry from Dr. Sherman's records that Solis "did relate significant occupational exposures at that time."

¶ 97        We find no error in the trial court's ruling. Where counsel's attempt to refresh recollection failed, counsel could not simply press on and ask if Solis disputed the contents of a letter Dr. Sherman sent to another physician. Counsel could have attempted to impeach

Solis's trial testimony through the introduction of *admissible* evidence sufficient to establish that Solis made the statement to Dr. Sherman. See, *e.g.*, *People v. Shatner*, 174 Ill. 2d 133, 153 (1996) (where witness testified that she did not remember giving a statement to detective, counsel could only impeach her through the testimony of the detective, not by using the detective's written statement on cross-examination). Moreover, because BASF now argues that this evidence was relevant to its statute of limitations defense, BASF must establish that the evidence was admissible not just for impeachment purposes, but as substantive evidence (*i.e.*, to prove that Solis did in fact relate "significant occupational exposures" to Dr. Sherman). Even though Solis's statement may be admissible as a party opponent admission, BASF must also establish that Dr. Sherman's letter meets some exception to the hearsay rule in order to rely on Solis's admission. See, *e.g.*, *Horace Mann Insurance Co. v. Brown*, 236 Ill. App. 3d 456, 461 (1992) (Where one out-of-court statement is found within another out-of-court statement, "both levels must fall within an exception to the hearsay rule in order to be used as substantive evidence."). Where BASF did not properly pursue any questioning to impeach Solis or to introduce his statement as an admission of a party opponent, the trial court did not err in its ruling.

¶ 98                                    Instructional Errors

¶ 99      BASF presents two arguments as to the jury instructions. The trial court's decision on which instructions to give the jury will not be disturbed absent an abuse of that discretion. *Simms*, 192 Ill. 2d at 412. The standard for deciding whether a trial court abused its discretion is whether the instructions fairly and fully apprised the jury of the relevant law. *Schultz*, 201 Ill. 2d at 273-74.

¶ 100     BASF argues that the trial court abused its discretion in giving IPI 400.10, which states in part, "it is not a defense that the condition of the product could not have been discovered by BASF Corporation or that care was used in the manufacture of the product." The trial court noted that it gave the instruction to address BASF's contention that BASF did not breach its duty to warn because it did not know of the harmful effects of diacetyl and did not know of the LC50 study before Solis's exposure. We agree with BASF that the instruction should not have been given. While BASF argued that it could not have known about the harmful effects of diacetyl, it did not advance a "due care" defense by claiming that BASF exercised care in the manufacturing process or could not discover the condition of the product. See *Baier v. Bostitch*, 243 Ill. App. 3d 195, 208 (1993) (Illinois Pattern Jury Instructions, Civil, No. 400.10 (2d ed. 1971) was appropriate where defendant's engineer "testified as to the defendant's extensive testing processes and as to the developments and new materials in manufacturing processes"). BASF was a distributor, not a manufacturer. Moreover, Illinois Pattern Jury Instructions, Civil, No. 400.10 (Supp. 2009) (hereinafter, IPI Civil (Supp. 2009)) "should not be given if plaintiff's claim of liability is failure to warn." IPI Civil (Supp. 2009) No. 400.10, Notes on Use, at 120. In this case, IPI Civil (Supp. 2009) No. 400.07D addressed the appropriate standard for the failure-to-warn claim by instructing the jury that "BASF Corporation has a duty to adequately warn and instruct the user about the dangers of its product[s] of which it knew, or, in the exercise of ordinary care, should have known, at the time the product left its control." IPI Civil (Supp. 2009) No. 400.07D.

That instruction fully addressed any claim that BASF did not know or should not have known about the harmful effects of diacetyl. See *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 35 (1980) (finding that the "knew or should have known" standard is appropriate for strict liability failure-to-warn cases).

¶ 101 BASF argues that the trial court abused its direction in giving IPI Civil (Supp. 2009) No. 400.07C, stating that "BASF Corporation has the duty to manufacture and sell a product that is not in an unreasonably dangerous condition. That duty cannot be delegated to another." While it was unnecessary to include a reference to a "duty to manufacture" with respect to BASF, the trial court did not abuse its discretion in giving IPI Civil (Supp. 2009) No. 400.07C, stating that BASF has a nondelegable duty to "sell a product that is not in an unreasonably dangerous condition." An instruction is justified when it is supported by some evidence, even slight, in the record. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995). Here, a BASF employee testified that employers like Flavorchem are required by OSHA to understand the chemicals that are brought into the workplace and the engineering controls needed to handle those chemicals. We find no abuse of discretion in giving this instruction based on the evidence before the trial court.

¶ 102                              CONCLUSION

¶ 103 We conclude that it was error to direct a verdict in favor of Solis on the statute of limitations issue, and we must therefore reverse and remand for a new trial. We also find errors in the admission of evidence and the jury instructions. Solis nonetheless argues that any proceedings on remand should be limited to the question of Solis's liability, leaving the damages award to stand. We disagree. The evidentiary and instructional errors are intertwined with the extent of BASF's liability, especially with regard to the scope of BASF's duty to warn, and those issues affect the jury's determination on damages. A liability-only retrial is therefore inappropriate. See *Banovz v. Rantanen*, 271 Ill. App. 3d 910, 920 (1995) (exercising discretion to order partial liability-only retrial where amount of damages awarded to plaintiffs was completely unaffected by error in failing to dismiss defendants' counterclaims against one another); *Tyco Electronics Corp. v. Illinois Tool Works, Inc.*, 384 Ill. App. 3d 830, 835 (2008) (finding damages-only retrial inappropriate where "the precise acts for which a defendant is held liable determine the extent of liability"). For the foregoing reasons, we reverse and remand for a new trial.

¶ 104 Reversed and remanded.